**UNITED STATES of America**

v.

**Dante HARVEY and Demarr Harvey.**

**No. CR. 3:02CR18.**

United States District Court,
E.D. Virginia,
Richmond Division.

June 7, 2002.

Michael T. Hosang, Assistant United States Attorney, United States Attorney's Office, Richmond, VA, for United States.

Brent A. Jackson, Hill, Tucker, Marsh & Jackson, PLC, Richmond, VA, for Dante Harvey.

Robert J. Wagner, Office of the Public Defender, Richmond, VA, for Demarr Harvey.

## MEMORANDUM OPINION

PAYNE, District Judge.

Dante Harvey ("Dante") is charged with possession with intent to distribute cocaine base, possession of cocaine base, possession with intent to distribute marijuana, possession of marijuana and possession of a firearm during and in relation to/in furtherance of a drug trafficking crime. Demarr Harvey ("Demarr") is charged with possession with intent to distribute cocaine base, possession of cocaine base, possession of marijuana and possession of a fire-

arm during and in relation to/in furtherance of a drug trafficking crime.

Dante has moved to suppress evidence obtained as a result of an allegedly illegal seizure, illegal arrest and illegal warrantless entry into his apartment. Demarr has moved to suppress evidence obtained as a result of warrantless entry into Dante's apartment [1] and the seizure of his person.

## STATEMENT OF FACTS

On December 23, 2001, Dante, two male acquaintances and a female friend, Unique Hutchinson, were gathered in a public hallway of an apartment complex at 3916 Chamberlayne Avenue, a location noted for drug distribution and violent crime. For those reasons, Officers Michael Spinos, William Blackwell, and Sergeant Thomas Lloyd of the Richmond Police Department routinely patrolled the neighborhood and this specific building. As the officers approached the building, they saw four individuals in the hallway and decided to investigate. The hallway was visible through plexiglass in the door. As the officers approached the door, they smelled the odor of burning marijuana coming from within the hallway, and they observed Dante holding an open bottle of beer. Suppression Hearing Transcript, p. 9 (hereinafter "Tr. p. __"). The door to the hallway, which was typically locked, had been left ajar by one of the individuals. The officers entered the hallway with guns drawn. As the officers opened the door to the hallway, they could still smell the odor of marijuana and could see smoke hanging in the air. Tr. pp. 8–9, 40, 42, 43. The officers ordered the individuals to step outside for further investigation and the three males were placed in handcuffs for the officers' safety, while the officers sought to determine whether any of the individuals were trespassing and who was smoking marijuana.

Upon request, Dante provided identification and informed the officers that he resided in Apartment 1A of the building in which the group had been gathered. When the officers asked whether they could look in his apartment, Dante allegedly gave his consent. The apartment keys, allegedly provided by Dante, did not work on Apartment 1A, and the resident of that apartment stated that Dante did not live there, but that he had seen Dante around the complex.[2]

While the officers conducted the standard computer query for outstanding warrants and attempted to confirm whether Dante was, as he said, a resident at the apartment complex, Dante was fidgeting and, although handcuffed, was reaching around his back at the waistband area of his trousers. Tr. pp. 74. Officer Steven McQuail asked Dante whether he "had anything on him." Dante did not respond, but, after Officer McQuail started to pat around the waistband, Dante admitted that he had a gun in his pocket. Tr. pp. 74–75. Dante volunteered the information that he carried the weapon because, sometime ago,

---

1. After hearing evidence on the issue on April 26, 2002, the Court determined that Demarr was an overnight guest at Dante's apartment within the meaning of *Minnesota v. Olson*, 495 U.S. 91, 96–97, 110 S.Ct. 1684, 109 L.Ed.2d 85 (1990) ("Olson's status as an overnight guest is alone enough to show that he had an expectation of privacy in the home that society is prepared to recognize as reasonable.") and *Minnesota v. Carter*, 525 U.S. 83, 90, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)

("an overnight guest in a home may claim the protection of the Fourth Amendment, but one who is merely present with the consent of the householder may not.").

2. During the search for his correct address, Dante was issued a summons for drinking in a public place. Dante contends that during his conversation with his friends he was not in possession of an alcoholic beverage.

he had been shot while in the vicinity of the apartments. Dante also stated that the pistol was in his front pocket. Officer McQuail then retrieved the loaded pistol. At about the same time, the computer query for outstanding warrants revealed that there was an outstanding warrant for Dante's arrest. Thereupon, Dante was arrested based on the warrant and for carrying a concealed weapon, and, during the search incident to arrest, Officer Caldwell found on Dante's person, a plastic bag with 17 individually wrapped rocks of crack cocaine, $267, two bags of marijuana, and a cellular telephone.

By that time, other officers had ascertained that Dante did not in fact live in Apartment 1A as he previously had represented. Thus, Dante was again asked where he lived and, without answering verbally, Dante made a motion with his head that the officers took to indicate Apartment 6A on the second floor of the building. As Dante was being led to a police cruiser, the officers began to make their way up the stairs of the apartment building to try Dante's keys at Apartment 6A, which they believed to be Dante's apartment. As Dante was en route to the police cruiser, he began to yell to the police that they did not have consent to search his apartment and that they would need a warrant to do so. Though they had been trying the key in various apartments on the first floor of the complex, the officers claim that once Dante yelled that they had to have a warrant to search his apartment, the officers feared that someone inside Apartment 6A might have heard Dante yelling and might destroy evidence that might be located in the apartment. The windows to the apartment on the second floor were closed, but the window on the stair landing between the second and third floors was open.

Officer Spinos and Sergeant Lloyd testified that they intended to verify that Dante lived in Apartment 6A by using the key to open the door and then secure the apartment while they obtained a search warrant. After knocking several times, and not hearing any noise from within the apartment, the officers used Dante's key to open the door to Apartment 6A. Officer Cappelli pushed the door open and Officer Spinos stuck his head inside. Demarr, who was in a sleepy daze, was sitting on a couch with a gun next to him. Demarr looked at the officers, then looked at the gun. Acting in the interest of their own safety, and Demarr's, the officers immediately ordered Demarr to the floor, handcuffed him and asked for his identification. Demarr responded that his identification was in his front pocket and gave consent for the officers to retrieve the identification card. When Officer Spinos pulled the card out of Demarr's pocket, he saw a plastic bag sticking out of from his pocket which, based on experience, he believed to contain crack cocaine. Officer Spinos then pulled from Demarr's pocket the plastic bag, which contained 37 individual rocks of crack cocaine. The officers conducted a protective sweep of the apartment, secured it and obtained a warrant to search it. Executing the warrant, the police searched Demarr, finding a bag of marijuana, $108 and a $40 check on his person. The search of the apartment also revealed plastic baggies and tobacco from unrolled cigars.

## DISCUSSION

To some extent, Dante and Demarr make similar arguments in support of their respective suppression motions, but there are sufficient differences to necessitate separate discussion of each motion.

### I. *Dante Harvey's Claims*

#### A. Whether There Was Reasonable Suspicion To Detain Dante

Dante argues that the police acted under an "inchoate and unparticularized suspi-

cion or hunch" when they detained him because they smelled the odor of marijuana as they approached and entered the hallway. In other words, Dante contends that the police did not have a reasonable articulable suspicion of criminal activity when they detained him.

■ In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court recognized that "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possible criminal behavior even though there is no probable cause to arrest." *Terry*, 392 U.S. at 22, 88 S.Ct. 1868. In determining the reasonableness of officers' actions during a *Terry* stop, the Court must balance the need to search or seize against the invasion into constitutionally protected interests the search or seizure entails. *Terry*, 392 U.S. at 20–21, 88 S.Ct. 1868. The officer, of course, must be able to articulate something more than an "inchoate and unparticularized suspicion or 'hunch.'" *Id.*, at 27, 88 S.Ct. 1868. The Fourth Amendment requires "some minimal level of objective justification" for making the stop. *INS v. Delgado*, 466 U.S. 210, 217, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). "That level of suspicion is considerably less than proof of wrongdoing by a preponderance of the evidence." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). The Supreme Court has held that probable cause means "a fair probability that contraband or evidence of a crime will be found," *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and the level of suspicion required for a *Terry* stop is less demanding than that for probable cause, *see United States v. Montoya de Hernandez*, 473 U.S. 531, 541, 105 S.Ct. 3304, 87 L.Ed.2d 381 (1985). The officer "must be able to point to specific and articulable facts which, taken together

with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21, 88 S.Ct. 1868.

As the United States Court of Appeals for the Fourth Circuit held in *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir.1982):

> In enforcing this principle, the courts must apply objective standards in determining whether at the time of the seizure the requisite degree of suspicion existed. [citation omitted]. In doing this they should of course take into account that trained law enforcement officers may be 'able to perceive and articulate meaning in given conduct which would be wholly innocent to the untrained observer.' [citation omitted]. Still, any such special meaning must be articulated to the courts and its reasonableness as a basis for seizure assessed independently of the police officer's subjective assertions, if the courts rather than the police are to be the ultimate enforcers of the principle. [citation omitted]. *United States v. Gooding*, 695 F.2d at 82; *see also Michigan v. DeFillippo*, 443 U.S. 31, 37, 99 S.Ct. 2627, 2632, 61 L.Ed.2d 343 (1979).

Against this background it is important to recall the controlling principle of *Terry* and its progeny which is that:

> [a] brief investigative stop is permissible when the investigating officers have a *reasonable suspicion grounded* in 'specific and articulable *facts' that* the person stopped *is, is about to be, or has been involved in criminal activity.* [citations omitted] (emphasis added).

*United States v. Betemit*, 899 F.Supp. 255 (E.D.Va.1995).

■ In *United States v. Crittendon*, 883 F.2d 326, 328 (4th Cir.1989), the Fourth Circuit held that, in determining whether reasonable suspicion exists, a court must

consider "the totality of the circumstances confronting a police officer including all information available to an officer and any reasonable inferences to be drawn at the time of the decision to stop a suspect." "Reasonable suspicion is a commonsensical proposition. Courts are not remiss in crediting the practical experience of officers who observe on a daily basis what transpires on the street." *United States v. Lender*, 985 F.2d 151, 154 (4th Cir.1993). In *United States v. Cephas*, 254 F.3d 488, 495 (4th Cir.2001), the Fourth Circuit held that the odor of marijuana coming from an apartment "alone would almost certainly have given [the officer] *probable cause* to believe that contraband-marijuana-was present in the apartment." (emphasis supplied) (citing to *United States v. Grissett*, 925 F.2d 776 (4th Cir.1991) (holding that the odor of marijuana coming from a motel room provided exigent circumstances to justify a warrantless entry.)).

■ Application of these governing principles leads to the conclusion that the investigative stop and detention of Dante was not an unlawful seizure. To begin, the police were patrolling in a high crime area and this particular address had been the locus of drug and violent crime many times in the recent past. Consequently, this particular address was patrolled several times each night. Dante's initial detention was based on the fact that Officer Spinos smelled the odor of marijuana outside the hallway where Dante and three others were assembled. As the officers approached the apartment building, the smell became increasingly strong. Using this fact, the police entered the hallway of the apartment building with guns drawn, ordering everyone outside, and handcuffed the males. A cloud of marijuana smoke was observed in the hallway. Tr. p. 47.

Dante argues that the smell of marijuana alone is not adequate "reasonable suspi-cion" to justify an investigatory detention. Given that the police were in a high crime area, were approaching a building known to be a center for drug activity and violence, could smell the odor of burning marijuana at the entrance of the apartment building and inside the hallway, and could see smoke in the hallway, the police had a reasonable suspicion that criminal activity was afoot sufficient to warrant a *Terry* stop to investigate the source of the marijuana smell.

### B. Dante Was Not Arrested For Drinking In A Public Place

Dante argues that he was arrested for drinking in a public place and that his arrest is unlawful because, under Virginia law, violation of the state's open container law does not authorize an arrest. Putting aside the fact that federal constitutional principles, not state law, govern the lawfulness of Dante's arrest, the argument is irrelevant because Dante was not arrested for violation of the open container law. Tr. pp. 80–81. Indeed, it is clear that he was not arrested until after the concealed weapon and arrest warrant were discovered and those were the reasons for Dante's arrest.

### C. Detention Did Not Rise To The Level Of An Arrest, Which Demands Probable Cause

■ Dante also seems to be arguing that the initial investigatory stop escalated to an unlawful arrest before there were grounds for a lawful arrest. If this is truly one of his arguments it is settled in this Circuit that "[b]rief, even if complete, deprivations of a suspect's liberty do not convert a stop and frisk into an arrest so long as the methods of restraint used are reasonable to the circumstances." *Crittendon*, 883 F.2d at 329. (citing to *United States v. Perate*, 719 F.2d 706, 708–09 (4th

Cir.1983) (fact that officers approached suspect's car with drawn weapons did not convert stop into an arrest); and *United States v. Bautista*, 684 F.2d 1286, 1289 (9th Cir.1982) (use of handcuffs during stop and frisk does not convert encounter into a custodial arrest)). Here, the officers were in a high crime area, and smoking marijuana is a crime. Further, the building in which the four people were gathered was so often the situs of violent activity that it had to be patrolled every night.

It is reasonable to believe that one or more of the persons congregated in the hallway might possess a weapon or try to escape. While the use of drawn guns and handcuffs may seem excessive in the safety of a courtroom, to an officer on this beat, those measures were " 'reasonably necessary to maintain the status quo and protect [officers] safety during an investigative stop.' " *Crittendon*, 883 F.2d at 329 (quoting *United States v. Taylor*, 857 F.2d 210, 213 (4th Cir.1988)).

### D. The Police Had Probable Cause To Arrest Dante

Dante argues that the police did not have the probable cause to arrest him. An arrest warrant issued by a neutral magistrate judge must be based on probable cause. Once it was revealed that there was an outstanding warrant for Dante's arrest, the requisite criteria for arrest had been met. Additionally, Dante admitted to the police that he was in the possession of a concealed weapon. That is a violation of state law. These two facts fully satisfy the standard of probable cause necessary for arrest.

After discovering the arrest warrant and the concealed weapon on Dante's person, he was arrested and a subsequent search revealed the possession of crack cocaine, marijuana and a signifi-

cant amount of currency. Given that the arrest both under an arrest warrant and for concealing a weapon was lawful, the subsequent search was lawful because "[w]hen an arrest is made, it is reasonable for the arresting officer to search the person arrested in order to remove any weapons that the latter might seek to use in order to resist arrest or effect his escape.... In addition, it is entirely reasonable for the arresting officer to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Chimel v. California*, 395 U.S. 752, 762, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

### E. The Warrantless Entry Into Defendant's Apartment Was A Violation Of Defendant's Constitutional Rights

The Fourth Amendment protects persons from unreasonable searches and seizures. The Supreme Court has interpreted this to mean that before the police may search any area in which a suspect has a reasonable expectation of privacy, they must have probable cause to believe that the area to be searched contains evidence of criminal activity and the police must obtain a search warrant from a neutral magistrate judge. *United States v. Harris*, 403 U.S. 573, 91 S.Ct. 2075, 29 L.Ed.2d 723 (1971). And, "[w]arrantless entries into a residence are presumptively unreasonable." *United States v. Cephas*, 254 F.3d 488, 494 (4th Cir.2001) (citing *Payton v. New York*, 445 U.S. 573, 586, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980)). Certain exceptions to the warrant requirement have been recognized, and the realistic threat that evidence will be destroyed is one of the "exigent" circumstances allowing entry of a residence without a warrant. *See, e.g., Mincey v. Arizona*, 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978);

*Schmerber v. California,* 384 U.S. 757, 770–771, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966); *Preston v. United States,* 376 U.S. 364, 367, 84 S.Ct. 881, 11 L.Ed.2d 777 (1964); *United States v. Taylor,* 90 F.3d 903, 907 (4th Cir.1996).

■■■ In *Cephas,* the Fourth Circuit held that "where police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a warrant, exigent circumstances justify a warrantless entry." *United States v. Cephas,* 254 F.3d at 494–95; *see also United States v. Campbell,* 945 F.2d 713, 715 (4th Cir.1991). In *United States v. Turner,* 650 F.2d 526, 528 (4th Cir. 1981), the Fourth Circuit articulated a framework for assessing whether the risk that evidence will be destroyed exists to such an extent as to constitute an exigency that permits warrantless entry into a residence. Citing *United States v. Rubin,* 474 F.2d 262 (3d Cir.1973), the Fourth Circuit held that:

"(t)he emergency circumstances will vary from case to case and the inherent necessities of the situation at the time must be scrutinized." 474 F.2d at 268. The court went on to catalog some of the factors courts have considered relevant in determining whether exigent circumstances exist in a particular case. These include: (1) the degree of urgency involved and the amount of time necessary to obtain a warrant; (2) the officers' reasonable belief that the contraband is about to be removed or destroyed; (3) the possibility of danger to police guarding the site; (4) information indicating the possessors of the contraband are aware that the police are on their trail; and (5) the ready destructibility of the contraband. 474 F.2d at 268–69.

*United States v. Turner,* 650 F.2d at 528 (quoting *United States v. Rubin,* 474 F.2d at 268). "The proper inquiry focuses on what an objective officer could reasonably believe" in determining whether circumstances exist to permit a warrantless search. *United States v. Grissett,* 925 F.2d 776, 778 (4th Cir.1991) (citing as authority *United States v. Socey,* 846 F.2d 1439, 1446 (D.C.Cir.1988)).

### 1. There Was Probable Cause To Believe That Evidence Of Illegal Activity Was Present In Dante's Apartment

As explained in *Cephas,* the first step in the analysis is to ascertain whether the officers, from an objective viewpoint and given all of the information available at that point, had the requisite probable cause to believe that evidence could be found inside Dante's apartment. The record here supports a conclusion that there was probable cause to believe that evidence of crime could be found in Dante's apartment.

First, the neighborhood in which Dante lived was a known drug trafficking area and the building where he lived was noted as a situs of drug distribution. Second, when arrested, Dante was in possession of drugs that were packaged for sale and a loaded weapon. Thus, Dante was likely a drug dealer in possession of both his wares and the tools of his trade, and he was in an area where his trade could be plied.

It is certainly reasonable to believe that Dante did not keep all his inventory on his person and to believe that he would store the inventory where he could have ready access to it. It is also reasonable to believe that Dante would use his residence as a storage, cutting and packaging site, particularly since it was situate in close proximity to the market area.

Third, although Dante acknowledged living in the building, he lied about the specific apartment in which he lived. It is reasonable to believe that a drug dealer who conceals from the police the location of his residence might well have a supply of drugs hidden there.

These facts would be sufficient to establish probable cause that evidence of drug trafficking could be found in Dante's residence. The first facet of the test is then proven by this record.

### 2. There Was No Reasonable Belief That Evidence May Be Destroyed Before A Warrant Could Be Obtained

To assess the claim that the exigency of possible evidence destruction necessitated a warrantless entry into Dante's apartment, it is necessary to apply the *Turner/Rubin* factors.

There is no evidence of possible danger to police who would be securing the site. Nor is there any evidence about the amount of time required to obtain a warrant. Nor does the record contain any evidence of the ready destructibility of contraband, but it is well-known that crack and marijuana are readily destructible. The same cannot be said of scales, razors, pipes, baggies and other drug paraphernalia.

The factors of urgency, the belief that contraband is about to be removed, and knowledge that possessors of contraband are aware that police are on their trail all depend upon three facts. First, and foremost, the claim of exigency depends on the fact that, as the officers entered the building to go to Apartment 6A, Dante yelled that he would not consent to the search or that they could not search without a warrant. Second, the United States points to the fact that there was an open window in the hallway at the landing below Dante's apartment. Third, the United States notes that the detention of Dante and his friends and Dante's arrest was obvious to anyone who might have been in Dante's apartment looking out the window. Tr. pp. 20, 21 (Officer Spinos); Tr. pp. 114–15 (Officer Lloyd). From these facts, the officers concluded that someone was in Dante's apartment and was about to destroy whatever evidence might be there. However, the officers testified that they were aware of no evidence that anyone was in the apartment. Moreover, when the officers knocked on the door to Apartment 6A, there was no sound from within the apartment to indicate that it was occupied.

The United States responds, stating that, once Dante started shouting that the police could not enter his apartment without a warrant, the officers reasonably believed that others might be in the apartment and that Dante was signaling them to destroy any remaining evidence. However, at the time that Dante began shouting to the police, the officers had been trying his keys in doors on the first floor of the apartment complex and were heading to the second floor, and they were moving away from him. It does not seem particularly strange that Dante was shouting to the police, considering that he was outside of the building and the officers were inside the building and Dante was being taken away to a police cruiser. On this record, it cannot be said that there was a reasonable belief that contraband was about to be destroyed.

That point is perhaps best illustrated by consideration of the decisions on which the United States relies to support its position that the officers could enter Defendant's apartment without a warrant based on the exigency that evidence might be destroyed. For example, in *United States v. Socey*, 846 F.2d 1439 (D.C.Cir.1988), offi-

cers had received information from a confidential informant about a drug trafficking scheme involving several suspects who were running drugs from Florida to Washington, D.C. After corroborating the confidential informant's information, the police set up surveillance of the defendant's residence. The police then stopped a vehicle just after it pulled away from the defendant's residence and found significant amounts of narcotics inside. Later, they stopped a second vehicle after it left defendant's residence. Drugs were found in this car as well. The second vehicle had been detained in clear view of the defendant's house; and, shortly thereafter, two marked police cars arrived to assist and neighbors began to congregate to view the situation. At this time, fearing that the commotion would alert those in the house to the police presence, the police decided to enter the residence and "secure" the premises to ensure that evidence would not be destroyed. The court, upholding the warrantless entry, held that an officer can establish that he reasonably believed that evidence would be destroyed if he can show: "(1) a reasonable belief that third persons [were] inside a private dwelling and (2) a reasonable belief that these third persons are aware of an investigatory stop or arrest of a confederate outside the premises so that they might see a need to destroy evidence." *Id.*, at 1445. Here, the officers had no belief that anyone was in Dante's apartment. They simply thought that it might be possible because of the volume of Dante's speech when he revoked consent to search.

In *United States v. Gaitan–Acevedo*, 148 F.3d 577 (6th Cir.1998), officers had suspected drug dealers under surveillance while they traveled from San Diego to Detroit to deliver marijuana. The officers observed the four men check into a hotel together and the officers knew which rooms the four men had reserved.

Through the use of a surveillance device worn by an undercover agent, officers listened to conversations respecting the marijuana shipment. The undercover agent observed one of the suspects talking on the in-house phone about his plans for the shipment. When officers arrested that suspect in his hotel room, they observed that he had been talking on his cellular phone, which he had dropped without turning it off when the officers had arrived. Fearing that the person on the other end of the phone line could hear what was happening, the officers went to another of the suspect's rooms, entered it, and arrested the co-defendant. The Sixth Circuit held that "[i]t was not unreasonable for officers to believe [defendant's] companions, who had not yet been arrested, would have been alerted of the arrest [of the defendant] through the open phone line, and imminently would have destroyed the evidence or fled the hotel. Accordingly, the DEA agents were entirely justified under exigent circumstances to immediately enter and seize evidence upon the [co-defendant's] arrest." *Gaitan–Acevedo*, 148 F.3d at 585–86.

In *United States v. Pierson*, 219 F.3d 803 (8th Cir.2000), officers received a tip regarding a possible drug transaction and set up surveillance near a particular hotel room where they observed two males exit the room, drive to an airport where a female carrying a black garment bag joined them and drove back to the hotel. The tip had forecast the occurrence of those events and, further, had alerted the officers that there would be a substantial amount of contraband in the black garment bag. Officers observed one of the three suspects drive away from the hotel. That suspect was stopped and no contraband was found within the car. Fearful that the suspect in the car would alert the two suspects in the hotel, the police decid-

ed to arrest one of the suspects in the hall just outside of his room. Thereafter, the officers entered the hotel room and arrested the remaining individual. The Eighth Circuit held that officers were permitted to enter a hotel room where the defendant was arrested outside of the room and the other suspect still in the room could have heard the commotion and destroyed the narcotics while the officers waited for a search warrant.

In *United States v. Frierson*, 299 F.2d 763, 766 (7th Cir.1962), officers identified themselves when the defendant opened his front door, which was latched by a door chain. The defendant told the officers to wait a moment and he closed the door, at which time the officers heard the defendant tell someone to "get rid of the stuff." At that time agents at the rear door forced their way into the house as did those at the front door. The Seventh Circuit held that "[w]hen the agents in the instant case heard defendant say 'Get rid of the stuff,' it was imperative that they enter at once in order to prevent the unlawful destruction of evidence which they could reasonably believe was in the apartment."

These decisions teach that a reasonable belief that evidence is about to be destroyed must be based on objective facts which logically lead to that belief. The facts here do not do that. There was no reason to believe the apartment was occupied. The fact that Dante was yelling to revoke his consent was unremarkable given the distance between him and the officers, the fact that the distance was widening as Dante was being led away and that he was outside of the building. The open window was in a hall, not in Dante's apartment. And, the activity outside the building meant nothing unless someone was in the apartment. Thus, when all is said, it is the fact that Dante yelled when he revoked consent that is the sole basis for the asser-

tion of the exigency that evidence was about to be destroyed. That is not sufficient to animate the exigent circumstances exception.

The case cited by the United States that most resembles this case is *Socey*, where the Court of Appeals for the District of Columbia Circuit held that a fear of the destruction of evidence justified a warrantless entry into a house, where a drug-related arrest was in progress in plain view of the house where an individual had just obtained the drugs. The difference in that case, indeed, all of the cases cited by the United States, was that officers knew from surveillance that there was evidence in the house that could be destroyed and knew that there were people in the house that could destroy the evidence. The offenders in each of the cited cases had been surveilled and otherwise followed well before the events leading to exigent circumstances in each of the cases.

 The evidence in this case, or lack thereof, militates against a reasonable belief that third persons inside Dante's apartment might have been aware of what was going on outside the apartment complex, so that they might see the need to destroy evidence. On this basis, Dante's motion to suppress evidence discovered as a result of the illegal search of Defendant's apartment is granted.

## II. Demarr Harvey's Claim

### A. Warrantless Entry Into Dante Harvey's Apartment

 Demarr claims that, as a result of illegal actions of the police leading up to an unlawful warrantless entry of Dante's apartment, evidence against him discovered as a result of the warrantless entry also should be suppressed. Having previously held that Demarr enjoys the same expectation of privacy in the apartment as does

**558**

Dante, and having granted Dante's motion to suppress the yield of the illegal entry into the apartment, it is appropriate to grant Demarr's motion to suppress evidence obtained as a result of the same warrantless entry as well. Having granted Demarr's motion to suppress, it is unnecessary to decide the merits of Demarr's claim of illegal seizure upon entry of the police officers into Dante's apartment.

### CONCLUSION

For reasons stated above, Dante Harvey's Motion to Suppress is Granted only for the purpose of suppressing evidence obtained as a result of the illegal entry into his apartment. Similarly, Demarr Harvey's Motion to Suppress is granted, and all evidence obtained as a result of illegal entry into Dante Harvey's apartment is hereby suppressed from use at trial.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.